ORIGINAL

RECEIVED
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

FEB 20 2004

No. 02-36155

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FILED 2-20-04 RY
DOCKETED 2-23-04 RY
DATE          INITIAL

NATIVE VILLAGE OF EYAK, et al.,

Plaintiffs-Appellants

v.

DONALD EVANS, Secretary of Commerce,

Defendant-Appellee

On Appeal from the United States District Court
for the District of Alaska

**SUPPLEMENTAL BRIEF OF APPELLEE SUPPORTING
HEARING EN BANC**

THOMAS L. SANSONETTI
Assistant Attorney General
Environment & Natl. Resources Div.
U.S. Department of Justice

Of Counsel:

ROBERT BABSON

NOAA General Counsel
Juneau, Alaska, 99802

BRUCE LANDON
WILLIAM B. LAZARUS
DAVID C. SHILTON
Attorneys
U.S. Dept. of Justice
P.O. Box 23795
Washington, D.C. 20026
(202) 514-5580

ORIGINAL

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. <u>Gambell III</u> is Inconsistent With The Supreme Court's
Paramountcy Cases To the Extent it Permits Alaska Natives
to Challenge Federal Action on the OCS/EEZ on the Basis of
Alleged Inconsistency With Aboriginal Hunting and Fishing
Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. Gambell III Misconstrued the Extinguishment Provisions of
ANCSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

BRIEF FORMAT CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

**CASES:**

<u>Confederated Tribes of Chehalis Indian Reservation v. State of Washington</u>,
96 F.3d 334 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,8
<u>County of Oneida v. Oneida Indian Nation</u>, 470 U.S. 226 (1985) . . . . . . . . . . 7
<u>Cramer v. United States</u>, 261 U.S. 219 (1923) . . . . . . . . . . . . . . . . . . . . 7
<u>Johnson v. McIntosh</u>, 21 U.S. (8 Wheat.) 543 (1823) . . . . . . . . . . . . . . . . . . 7,8
<u>Inupiat Community of the Arctic Slope v. United States</u>, 548 F. Supp. 182
(D. Alaska 1982), <u>aff'd on other grds</u>, 746 F.2d 570 (9th Cir. 1984),
<u>cert. denied</u>, 474 U.S. 820 (1985) . . . . . . . . . . . . . . . . . . . . . . 2,3,6,9,11
<u>Midwater Trawlers Co-operative v. Department of Commerce</u>, 282 F.3d 710
(9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
<u>Morris Friedman & Co. v. United States</u>, 351 F. Supp. 611 (Cust. Ct. 1972) . . 13
<u>Native Village of Eyak v. Trawler Diane Marie</u>, 154 F.3d 1090 (9th Cir. 1998),
<u>cert. denied</u>, 527 U.S.1003 (1999) (<u>Eyak I</u>) . . . . . . . . . . . . . . . . . . . 1,2,3,7

**CASES (continued):**

Nome Eskimo Community v. Babbitt, 67 F.3d 813 (9th Cir. 1995) . . . . . . . . . . 3

Village of Gambell v. Hodel, 869 F.2d 1273 (9th Cir. 1989) . . . . . . . . . . passim

Village of Gambell v. Clark, 746 F.2d 572 (9th Cir. 1984) (Gambell I),
     rev'd in part, vacated in part and remanded sub nom.
        Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987) 11,13,14

Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176
     (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,8,9

United States v. Atlantic Richfield Co., 612 F.2d 1132 (9th Cir.), cert. denied,
     449 U.S. 888 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,11,12

United States v. California, 332 U.S. 19 (1947) . . . . . . . . . . . . . . . . . . . . 4,5,8

United States v. Louisiana, 339 U.S. 699 (1950) . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Maine, 420 U.S. 515 (1975) . . . . . . . . . . . . . . . . . . . . . . . 5,9

United States v. Texas, 339 U.S. 707 (1950) . . . . . . . . . . . . . . . . . . . . . . . 5,6,7

United States v. State of Washington, 730 F.2d 1314 (9th Cir. 1984) . . . . . . . . . 9

PAGE

**STATUTES:**

Alaska Native Claims Settlement Act,
    Section 4(b), 43 U.S.C. 1603(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,14
    43 U.S.C. 1601(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,14

Magnuson Act,
    16 U.S.C. 1811(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    16 U.S.C. 1855(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Indian Nonintercourse Act,
    25 U.S.C. 177 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Outer Continental Shelf Lands Act,
    43 U.S.C. 1332(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    43 U.S.C. 1332(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Submerged Lands Act of 1953,
    67 Stat. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


**LEGISLATIVE HISTORY:**

<u>Alaska Native Land Claims: Hearings on S. 1830 Before Senate Comm.
    on Interior and Insular Affairs,</u> 91st Cong., 1st Sess., pt. I at 140
    (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# INTRODUCTION

In accordance with the Court's order of January 30, 2004, the appellee

Secretary of Commerce hereby submits the Department's position that this case

should be heard en banc. While, as our answering brief maintains at pp. 27-31, it

is possible to distinguish the instant case from Village of Gambell v. Hodel, 869

F.2d 1273 (9th Cir. 1989) (Gambell III), Gambell III continues to create

significant difficulties in this area of the law. We submit that Gambell III was

incorrectly decided in at least two respects:

- By ruling (869 F.2d at 1276-1277) that certain alleged aboriginal rights on
  areas of the Outer Continental Shelf (OCS) can be asserted against the
  United States without violating the doctrine of federal paramountcy; and

- By ruling (id. at 1278-1280) that any such aboriginal rights would not
  have been extinguished by the Section 4(b) of the Alaska Native Claims
  Settlement Act (ANCSA), 43 U.S.C. 1603(b).

This case meets the criteria for en banc consideration set out in Fed. R.

App. P. 35. Gambell III conflicts with the Supreme Court's paramountcy cases

discussed infra at 5-6. Moreover, it is in serious tension with Native Village of

Eyak v. Trawler Diane Marie, 154 F.3d 1090 (9th Cir. 1998), cert. denied, 527

U.S.1003 (1999) ((Eyak I), on the issue of whether alleged aboriginal rights on

the OCS can co-exist with federal paramountcy in that area. In our view, Eyak I properly applied the Supreme Court's precedents to find that the federal government's paramount authority over the waters of the OCS precludes the assertion of aboriginal title and exclusive hunting and fishing rights in that area.

Gambell III is also in tension with Confederated Tribes of Chehalis Indian Reservation v. State of Washington, 96 F.3d 334, 341 (9th Cir. 1996), and Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176, 180 n. 12 (9th Cir. 1981), as these cases indicate that in the absence of aboriginal title, aboriginal fishing rights simply cannot exist unless a treaty, statute or executive order specifically preserves them. Moreover, Gambell III's holding that any aboriginal rights on the OCS offshore Alaska were not extinguished by ANCSA conflicts or presents serious tensions with United States v. Atlantic Richfield Co., 612 F.2d 1132 (9th Cir.), cert. denied, 449 U.S. 888 (1980), and Inupiat Community of the Arctic Slope v. United States, 548 F. Supp. 182 (D. Alaska 1982), aff'd on other grds, 746 F.2d 570 (9th Cir. 1984), cert. denied, 474 U.S. 820 (1985). Thus, en banc consideration is necessary to secure uniformity of this Court's decisions, and consistency with Supreme Court precedent.

The issues presented by the rulings in Gambell III are also of exceptional importance, because aboriginal claims on the OCS can significantly interfere with

important national programs in the areas of fisheries and offshore mineral development.[1] Hence, hearing en banc would be warranted.

This case involves a challenge by several Alaskan Native Villages to regulations of the Department of Commerce applicable to the commercial harvest of sablefish (also called "black cod") and the commercial and non-commercial harvest of halibut. The Villages contend that the regulations improperly restrict the exercise of alleged non-exclusive aboriginal hunting and fishing rights in portions of the Exclusive Economic Zone (EEZ)[2] in Lower Cook Inlet and the Gulf of Alaska. They seek to have the Court recognize on their behalf a right to

_____

[1] Thus, claims of aboriginal rights have been asserted to block oil and gas lease sales in the <u>Gambell</u> litigation and in <u>Inupiat Community</u>, to challenge fishery regulations in <u>Eyak I</u> and in the instant case, and to block an offshore gold sale in <u>Nome Eskimo Community v. Babbitt</u>, 67 F.3d 813 (9th Cir. 1995). While <u>Nome Eskimo</u> was resolved on mootness grounds, the panel observed that were it not for the lack of a case or controversy "[i]t might be desirable, from a practical standpoint, to have some authoritative resolution of the aboriginal claims to rights in the outer continental shelf. The likely expense of responding to litigation may thwart socially worthwhile activity which the government properly seeks to facilitate." 67 F.3d at 816.

[2] When speaking of fishery resources, as opposed to minerals, it is more accurate to refer to the area beyond the three-mile limit of state jurisdiction as the "exclusive economic zone" (EEZ), rather than the OCS. See 16 U.S.C. 1811(a) (asserting "sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone."). As the principles of law on which this case turn apply equally to the OCS and the EEZ, the difference in nomenclature is not of any legal significance here.

harvest halibut and sablefish in the EEZ free of the regulations, and a right to enter the commercial sablefish and halibut fisheries without Individual Fishing Quota (IFQ) permits. The district court found it unnecessary to resolve whether the Villages can prove the factual predicate for the existence of aboriginal hunting and fishing rights in areas of the EEZ, concluding that the aboriginal rights alleged, if they could be established, would conflict with the federal government's paramount interests in the EEZ, and thus could not be recognized. 9/25/02 op. at 25-31.[3]

## DISCUSSION

**A. Gambell III is Inconsistent With The Supreme Court's Paramountcy Cases To the Extent it Permits Alaska Natives to Challenge Federal Action on the OCS/EEZ on the Basis of Alleged Inconsistency With Aboriginal Hunting and Fishing Rights.** – The Supreme Court has firmly established that paramount power over ocean areas is vested in the United States as a necessary element of national external sovereignty. In <u>United States v. California</u>, 332 U.S. 19 (1947), the Court rejected California's claim to ownership of the submerged lands within three miles of the coastline, and made clear that the protection and control of the adjacent seas is a function of national

_____

[3] Since the district court's two opinions are not published, we have attached them as an addendum to this brief.

- 4 -

external sovereignty which, under our constitutional system, requires paramount rights over the adjacent waters and their seabed to be vested in the federal government. 332 U.S. at 34. The Court stated that "the Federal Government has the paramount right and power to determine in the first instance when, how, and by what agencies * * * the oil and other resources of the soil of the marginal sea * * * may be exploited." 332 U.S. at 29. In subsequent litigation, the Court extended the paramountcy doctrine from the three-mile belt to the OCS. United States v. Louisiana, 339 U.S. 699, 704 (1950); United States v. Texas, 339 U.S. 707 (1950). In Texas, the Court concluded that, even if Texas as a Republic had full ownership and sovereignty over the adjacent seas and seabed, such prior ownership could not survive the State's admission to the Union. "Once low-water mark is passed the international domain is reached. Property rights must then be so subordinated to political rights as in substance to coalesce and unite in the national sovereign." 339 U.S. at 719. The Court reiterated the continuing vitality of the paramountcy doctrine in United States v. Maine, 420 U.S. 515 (1975).

Claims of aboriginal rights to hunt or fish free of federal regulations are as repugnant to the federal government's paramount rights as the rights asserted by the States in the paramountcy cases. This Court recognized in both Gambell III,

869 F.2d at 1276, and Eyak I, 154 F.3d at 1095, that the paramountcy doctrine

applies to Indian tribes in the same way it applies to States.  See also Inupiat

Community, supra, 548 F. Supp. at 185 (paramountcy doctrine barred claims by

Alaska North Slope Villages to rights on OCS).

Gambell III, however, created a troubling anomaly in this otherwise

consistent line of authority by holding that some claims of aboriginal rights on

the OCS might coexist with federal paramountcy.  Gambell III found that the

Villages' claims in that case to engage in subsistence hunting and fishing free of

significant interference from lessees under the Outer Continental Shelf Lands

Act were "rights of occupancy and use that are subordinate to and consistent with

national interests," and thus would not be in conflict with federal paramountcy.

869 F.2d at 1276.

This result cannot be squared with Supreme Court precedent.  In United

States v. Texas, the Court considered a similar argument that the State's claim to a

property interest without a sovereignty component would be subordinate to and

not in conflict with national sovereignty.  In response, the Court made clear that

the legal regime on the oceans is not the same as on land; although property and

sovereignty are "normally separable and separate, this is an instance where

property interests are so subordinated to the rights of sovereignty as to follow

sovereignty." Texas, 339 U.S. at 719. Federal paramountcy does not allow exceptions based on the particular nature of the rights being claimed. "If the property, whatever it may be, lies seaward of low-water mark, its use, disposition, management, and control involve national interests and national responsibilities." Texas, 339 U.S. at 719 (emphasis added).

Gambell III relied for its holding on three Supreme Court opinions involving aboriginal title to onshore lands. See 869 F.2d at 1277, citing County of Oneida v. Oneida Indian Nation, 470 U.S. 226 (1985); Cramer v. United States, 261 U.S. 219 (1923); Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543 (1823). None of these cases considered the unique legal regime of the OCS, where "[p]roperty rights must then be so subordinated to political rights as in substance to coalesce and unite in the national sovereign." Texas, 339 U.S. at 719. This Court in Eyak I correctly realized that the import of the Supreme Court's analysis in Texas was that "we simply have no power to split the rights in the OCS as the Native Villages would like." 154 F.2d at 1096. The Gambell III court's attempt to "split" the property regime on the OCS in a way that allows Native Villages to claim at least

some aboriginal rights that can be asserted against the United States is fundamentally at odds with the Supreme Court's paramountcy jurisprudence.[4]

Moreover, Gambell III's holding that some sort of aboriginal subsistence rights might exist on the OCS is in serious tension with Confederated Tribes of Chehalis Indian Reservation v. State of Washington, 96 F.3d 334, 341 (9th Cir. 1996), and Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176, 180 n. 12 (9th Cir. 1981). Those cases find that aboriginal fishing and hunting rights are an inherent component of aboriginal title, and generally do not exist

_____

[4] Gambell III also appears to be at odds with accepted principles regarding the origin of aboriginal title. Under the theory of aboriginal title, the European nations whose explorers established settlements in North America acquired title to the land already occupied by the Indians by the international law principle of "discovery." Johnson v. McIntosh 21 U.S. 543, 573-575 (1823). The Europeans' title was, however, subject to the Indians' right of occupancy which continued to burden the land as long as the Indians continued to use and occupy it. The use and occupancy of waters overlying the OCS by Alaska natives could not have given rise to aboriginal rights under federal law until the United States acquired sovereignty over Alaska in 1867. However, at that time the concept of territorial sovereignty over ocean areas seaward of the three-mile territorial sea was not established in customary international law. See United States v. California, 332 U.S. at 33. In fact, the practice of asserting any type of jurisdiction over the continental shelf is a mid-twentieth century development in international law. Thus, no rights to the OCS or its waters could arise or be recognized under either federal or international law as it existed in 1867. The Gambell III panel assumed that the Alaska natives' aboriginal rights were suspended inchoate in ocean areas awaiting the day when the United States claimed jurisdiction over the OCS and its superjacent waters and thus brought the aboriginal rights into legal existence. See 869 F.2d 1277. There is no basis in the law of aboriginal title for this result.

independently of aboriginal title unless reserved by statute, treaty or executive order. See Wahkiakum, 655 F.2d at 180 n. 12 ("An aboriginal right to fish has been recognized only in the context of interpretation of a ratified treaty or federal statute, where courts have held that aboriginal fishing rights were impliedly reserved to the Indians.")

While this Court has recognized Indian fishing rights on areas of the EEZ in Midwater Trawlers Co-operative v. Department of Commerce, 282 F.3d 710 (9th Cir. 2002), and United States v. State of Washington, 730 F.2d 1314 (9th Cir. 1984), those cases involved treaties that reserved rights to fish in these areas. A right reserved by treaty does not interfere with the nation's exercise of its external sovereign power; the treaty is, in fact, an exercise of the federal government's paramount powers. Cf. United States v. Maine, 420 U.S. at 524 (Congress' transfer to the States of rights to the seabed underlying the marginal sea in Submerged Lands Act of 1953, 67 Stat. 29, "was in no wise inconsistent with paramount national power but was merely an exercise of that authority").[5]

---

[5] In the exercise of its paramount authority over the waters of the OCS, Congress has acted to protect particular Indian fishing or hunting interests. These actions are inconsistent with the Villages' claim of rights to these same areas, as explained by the court in Inupiat Community, 548 F. Supp. at 187:

In the exercise of this jurisdiction, Congress has on occasion enacted statutory provisions permitting certain rights of subsistence

The Villages have not cited any case besides Gambell III in which aboriginal title or aboriginal hunting and fishing rights were held to exist in offshore waters in the absence of a treaty recognizing those rights. Gambell III has seriously unsettled the law relating to Indian fishing rights to offshore areas, and merits en banc consideration.

## B. Gambell III Misconstued the Extinguishment Provisions of ANCSA

– Gambell III also committed serious error by concluding that ANCSA did not extinguish any aboriginal claims that may exist on the OCS offshore Alaska. The first stated purpose of ANCSA was to address the:

> immediate need for a fair and just settlement of all claims
> by Natives and Native groups of Alaska, based on
> aboriginal land claims.

43 U.S.C. 1601(a)(emphasis added). Despite this clearly-stated purpose, the Court in Gambell III found that some aboriginal claims by Natives of Alaska, involving alleged aboriginal hunting and fishing rights on the OCS, were not settled by

---

for natives. See e.g., Fishery Conservation and Management Act of 1976, 16 U.S.C. 1801-1882 (Indian treaty fishing rights given special recognition). Marine Mammal Protection Act, 16 U.S.C. 1371(b) (Explicit exemption for native subsistence whaling). The necessary implication is that Congress intended to permit use by Alaska natives of subsistence rights only to the extent authorized. Hence, federal recognition of any sovereign power or property right arising out of subsistence activities would be both inconsistent and illogical.

ANCSA. The Court's narrow reading of the extinguishment provisions of ANCSA is clearly contrary to the statute, and conflicts with the reading given those provisions in United States v. Atlantic Richfield Co., 612 F.2d 1132 (9th Cir.), cert. denied, 449 U.S. 888 (1980), and in Village of Gambell v. Clark, 746 F.2d 572 (9th Cir. 1984) (Gambell I), rev'd in part, vacated in part and remanded sub nom., Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987).[6/]

The relevant extinguishment provision is Section 4(b) of ANCSA, which provides that:

> All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished.

43 U.S.C. 1603(b).

---

[6/] We recognize that the Supreme Court vacated the relevant portion of Gambell I in order to give this Court a new chance to construe ANCSA in light of the Supreme Court's interpretation of the phrase "in Alaska" for purposes of Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. 3120. Thus, strictly speaking, there is not a conflict between Gambell III and Gambell I. We believe, however, that the thorough analysis of ANCSA found in Gambell I is persuasive, and not undercut by the Supreme Court's interpretation of ANILCA. Moreover, Gambell I was followed in Inupiat Community of the Arctic Slope v. United States, 746 F.2d 570 (9th Cir. 1984), cert. denied, 474 U.S. 820 (1985). Inupiat stands in clear conflict with Gambell III.

In <u>Atlantic Richfield</u>, this Court held that Section 4 of ANCSA extinguished trespass claims based on aboriginal title, stating that (612 F.2d at 1137)(emphasis added):

> Indeed, in view of the repeated statements in the legislative history that the statute should be "broadly" applied to extinguish "all claims," and in view of Congress' knowledge of the Natives' trespass claims, it would be incomprehensible to us if Congress did not intend to extinguish the trespass claims, <u>along with all other claims based on aboriginal title</u>, when it gave the Natives over 60,000 square miles of fee simple land and almost a billion dollars.

It seems equally "incomprehensible" that Congress intended to preserve aboriginal claims to areas beyond the three mile limit of state jurisdiction while extinguishing all such claims within that limit. Indeed, the panel that decided <u>Gambell I</u> found not only that the stated purposes of ANCSA supported extinguishment of all aboriginal claims, but that specific legislative history "strongly suggest[s] that the reference to 'submerged lands' [in Section 4(b)] was intended to include lands on the outer continental shelf contiguous to Alaska * * * ." 746 F.2d at 577. The "specific legislative history" relied on by the <u>Gambell I</u> panel showed that the phrase "including submerged lands underneath all water areas both inland and offshore" was proposed by an oil industry representative, and subsequently adopted by Congress to extinguish any claims

that might be asserted to both State submerged lands and lands as to which the United States asserts jurisdiction "under the Outer Continental Shelf Lands Act."[2] The Gambell I panel also pointed to copious legislative history showing that the Act was intended to bring about a full extinguishment of "'any and all claims against the United States based on aboriginal title,'" including in particular all claims of aboriginal hunting and fishing rights. 746 F.2d at 578.

The panel in Gambell III refused to consider the clear legislative history relied on by the panel in Gambell I, because it found the language of Section 4 to be unambiguous. 869 F.2d at 1279. This refusal to consider on-point legislative history was erroneous. It cannot reasonably be concluded that Section 4(b) of ANCSA, viewed as a whole, is so unambiguous as to bar consideration of legislative history. The phrases "including submerged lands * * * both inland and offshore" and "including any aboriginal hunting or fishing rights that may exist," can as reasonably be read to add to the class of "claims of aboriginal title in Alaska" as it can to simply provide examples that are already in that class. See, e.g., Morris Friedman & Co. v. United States, 351 F. Supp. 611, 613 (Cust. Ct.

---

[2] Gambell I, 746 F.2d at 577, citing testimony of John Pickering in Alaska Native Land Claims: Hearings on S. 1830 Before Senate Comm. on Interior and Insular Affairs, 91st Cong., 1st Sess., pt. I at 140, 144 (1969).

1972).[8] Hence, an ambiguity as to the scope of the section is present, and resort to legislative history is warranted.

Gambell III's conclusion that the plain meaning of Section 4(b) preserves aboriginal claims of Alaska Natives on the OCS starkly conflicts with the stated statutory purposes of bringing about a settlement of "all claims by Natives and Native groups of Alaska, based on aboriginal land claims * * * ." 43 U.S.C. 1601(a). Further, as Gambell I found, the legislative history demonstrates a clearly expressed legislative intention to extinguish all aboriginal hunting and fishing rights, and other claims of aboriginal title, including those which might affect the OCS. Accordingly, the Gambell III panel's refusal to consider the relevant legislative history was improper.

For the foregoing reasons, Appellee submits that the case should be set for en banc hearing on the two issues discussed above.[9] Appellee would appreciate

---

[8] Nothing like the "including * * *" phrases at issue here can be found in the Alaska National Interest Lands Conservation Act (ANILCA); hence the Supreme Court's ruling in Amoco, 480 U.S. at 547-555, that "in Alaska" excludes the OCS, does not determine the issue in this case.

[9] There are other issues presented in this case, including: (1) whether, even if the Villages could otherwise claim aboriginal fishing rights on the EEZ, such rights would be subject to conservation regulations such as the halibut and sablefish regulations at issue; (2) whether Congress recognized non-treaty aboriginal fishing rights in the Outer Continental Shelf Lands Act (OCSLA) or the Magnuson Act; (3) whether the Indian Nonintercourse Act, 25 U.S.C. 177,

the opportunity to submit a supplemental brief on the merits of these issues,

should the Court decide to hear the case en banc.[10]

Respectfully submitted,

THOMAS L. SANSONETTI
Assistant Attorney General
Environment & Natl. Resources Div.

Of Counsel:

ROBERT BABSON
NOAA General Counsel
Juneau, Alaska 99802

90-2-4-09383
FEBRUARY 2004

BRUCE LANDON
WILLIAM B. LAZARUS
DAVID C. SHILTON
Attorneys
U.S. Dept. of Justice
P.O. Box 23795
Washington, D.C. 20026
(202) 514-5580

---

provides a cause of action to challenge fisheries regulations promulgated by the Secretary of Commerce; and (4) whether the Villages' challenges to regulations relating to sablefish promulgated under the Magnuson Act are barred because they were not filed within 30 days of promulgation, as required by 16 U.S.C. 1855(f)(1). As these issues do not require resolution of conflicts with Supreme Court or circuit authority, hearing them en banc would not appear warranted.

[10] The United States has consistently noted in briefs that it disagrees with the result in Gambell III, but has not briefed why Gambell III was incorrectly decided because of the binding nature of that precedent on other appellate panels.

# BRIEF FORMAT CERTIFICATION

I certify that this brief is proportionally spaced, has a typeface of 14 points, and contains 3,734 words as counted by counsel's word processing software.

David C. Shilton

# CERTIFICATE OF SERVICE

I certify that copies of the foregoing supplemental brief have been served, postage prepaid, by first class mail, on this 19th day of February, 2004, on the following counsel of record:

Lawrence A. Aschenbrenner
Heather Miller
420 L Street, Suite 505
Anchorage, Alaska 99501

Carol H. Daniel
731 E. 8th Avenue
Anchorage, Alaska 99501

James J. Davis, Jr.
Goriune Dudukgian
Alaska Legal Services Corporation
1016 West 6th Avenue, Suite 200
Anchorage, Alaska 99501

DAVID C. SHILTON

FILED

SEP 2 5 2002

UNITED STATES DISTRICT COU
DISTRICT OF ALASKA

_____ Dept

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

NATIVE VILLAGE OF EYAK, et al.,      )
                                     )
                    Plaintiffs,      )
                                     )
        vs.                          )
                                     )
DONALD EVANS, Secretary of           )
Commerce,                            )
                                     )      No. A98-0365-CV (HRH)
                    Defendant.       )
_____)

O R D E R

Cross-Motions for Summary Judgment

The parties simultaneously filed cross-motions for summary judgment.[1] Both motions are opposed.[2] Oral argument was requested and has been heard.

BACKGROUND

Plaintiffs are the Alaska Native villages of Eyak, Tatitlek, Chenega,[3] Nanwalek,[4] and Port Graham, all of which claim non-exclusive hunting and fishing rights in the outer continental

_____

[1] Plaintiffs' motion for summary judgment is at Clerk's Docket No. 24 and the Federal defendant's at Clerk's Docket No. 25.

[2] Clerk's Docket Nos. 30 and 31.

[3] The court's docket lists this village as "Chanega", which is another name by which this village is known.

[4] The Native Village of Nanweluk was formerly known as English Bay.

- 1 -

shelf (OCS).[5]  Defendant is Donald Evans, the Secretary of the Department of Commerce, who, pursuant to the Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1883, manages fisheries in a two-hundred-mile belt of ocean waters known as the Exclusive Economic Zone (EEZ).[6]

The issue of aboriginal rights being held in the OCS by Alaska Native villages was first litigated in People of the Village of Gambell v. Clark, 746 F.2d 572 (9th Cir. 1984) (Gambell I).  In Gambell I, two Alaska Native villages brought suit to enjoin the Secretary of Interior from selling leases for oil and gas exploration in Norton Sound Basin, which is off the western shore of Alaska.  The Villages argued that oil and gas exploration in Norton Sound conflicted with their exclusive aboriginal right to subsistence hunt and fish in those waters and the concomitant right to the minerals of the OCS underlying Norton Sound.  Assuming without deciding that the plaintiffs had an exclusive aboriginal right to hunt and fish in the waters above the lands involved in the lease-sale, the Ninth Circuit held that such rights were extinguished by the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601-29h.  The Villages also asserted statutory rights under the Alaska

_____

[5]    The OCS is "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 [of the Submerged Lands Act], and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control[.]"  43 U.S.C. § 1331(a).

[6]    The areas of the EEZ and OCS overlap but are not identical.  These areas lay beyond the State of Alaska and its territorial waters which, as a general proposition, extend three miles beyond the line of low tide or bay closure lines.

National Interest Lands Conservation Act (ANILCA), 16 U.S.C. §§ 3101-233. The Villages argued that the Secretary of Interior had failed to consider the impact the lease-sales would have on their subsistence rights as he was required to do by Section 810 of ANILCA. Id. at § 3120. Section 810 of ANILCA seeks to preserve the right of rural Alaskans to take fish and wildlife for subsistence purposes. Pursuant to Section 810, the head of any federal agency considering a lease of public lands in Alaska must determine the effect such a lease would have on rural residents' subsistence rights. The term "public lands" is defined in ANILCA as "land situated in Alaska[.]" 16 U.S.C. § 3102(3). The Ninth Circuit held that OCS lands and waters contiguous to the State of Alaska were included in the definition of "public lands" in ANILCA and remanded the case to the district court to consider whether the Secretary of the Interior had complied with section 810 of ANILCA.

On remand, the Villages unsuccessfully moved for a preliminary injunction. On appeal, the Ninth Circuit reversed, finding that the district court had "misapplied the law of the circuit concerning the 'unusual circumstances' exception and failed to honor the announced policy of Congress favoring the rights of Alaskan Natives over this nation's need to exploit the potential oil resources under the waters of the outer continental shelf off the shores of Alaska." People of the Native Village of Gambell v. Hodel, 774 F.2d 1414, 1428 (9th Cir. 1985).

The oil company lessees and the Secretary of Interior separately petitioned for certiorari, raising the questions of

whether the Ninth Circuit should have directed that a preliminary injunction be issued and whether section 810 of ANILCA applies to the OCS. The Villages cross-petitioned from the Court of Appeals' decision that ANCSA extinguished their aboriginal rights on the OCS. The oil company lessees' and the Secretary's petitions were granted, and the Villages' petition was held in abeyance pending the disposition of the other two petitions. The Supreme Court, in <u>Amoco Production Co. v. Village of Gambell, Alaska</u>, 480 U.S. 531 (1987) (<u>Gambell II</u>), held that the Ninth Circuit had erred in directing that a preliminary injunction be issued. The Court also held that section 810 of ANILCA did not apply to the OCS. The Court declined to decide the scope of ANCSA but granted the Villages' petition for certiorari that raised that question and remanded the case to the Ninth Circuit.

On remand, because the Supreme Court had foreclosed the plaintiffs' claim for statutory rights, the only question before the Ninth Circuit was whether the Villages had aboriginal rights in the OCS that had not been extinguished or preempted. <u>People of the Village of Gambell v. Hodel</u>, 869 F.2d 1273, 1275-76 (9th Cir. 1989) (<u>Gambell III</u>). The oil companies and the Secretary of the Interior raised several challenges to the Villages' assertion of aboriginal rights, three of which are pertinent to the discussion here: 1) that the existence of such exclusive rights was inconsistent with the external sovereignty of the United States; 2) that if aboriginal rights did exist in the OCS, they were extinguished by ANCSA, and

3) if those rights did exist, they were preempted by the Outer Continental Shelf Lands Act (OCSLA).

On the first issue, the Ninth Circuit held that, as a matter of law, the federal government's paramount interests in the OCS did not extinguish the aboriginal rights asserted by the Villages. On the second, the Ninth Circuit held that the Villages' aboriginal rights, if they did exist, had not been extinguished by ANCSA because the provisions of ANCSA do not extend past the territorial boundary of the State of Alaska. The Ninth Circuit declined to decide the third issue because it had not been raised below.[7] The circuit court remanded the case to the district court with instructions that on remand the district court must decide: 1) whether the Villages in fact possess aboriginal subsistence rights in the OCS; 2) if they possess those rights, whether the proposed lease-sales would interfere significantly with those rights; and 3) whether the OCSLA extinguishes aboriginal subsistence rights in the OCS as a matter of law.

On remand, the district court did not decide the three questions. Rather, it granted a motion for summary judgment brought by the government because the Villages had failed to provide evidence on whether the proposed lease-sales would interfere with their asserted aboriginal rights. On appeal, the Ninth Circuit

---

[7] This issue remains unresolved by the Ninth Circuit and is not raised here. The Secretary makes no such claim here probably in light of the express language that the OCSLA is not to be interpreted to "affect such [pre-existing] rights, if any, as may have been acquired under any law of the United States by any person in lands subject to [the Act.]" 43 U.S.C. § 1342.

found the case moot because the lease-sale that the Villages had originally challenged had terminated, and the Villages had failed to show that there was a continuing controversy. <u>People of the Village of Gambell v. Babbitt</u>, 999 F.2d 403 (9th Cir. 1993).

The <u>Gambell</u> litigation resolved two important issues: 1) that ANCSA did not extinguish aboriginal rights on the OCS and 2) that ANILCA does not apply to the OCS. The <u>Gambell</u> litigation also raised the possibility that some type of aboriginal hunting and fishing rights in the OCS could exist despite the federal government's paramount interest in the OCS.

It was against this backdrop that plaintiffs filed their initial lawsuit, in which they asserted <u>exclusive</u> aboriginal hunting and fishing rights on the OCS. This suit was captioned <u>Native Village of Eyak v. Trawler Diane Marie, Inc.</u>, Case No. A95-0063-CV (HRH)(<u>Eyak</u>). <u>Eyak</u> was filed against the Secretary of the Department of Commerce and others. In <u>Eyak</u>, plaintiffs alleged that they were entitled to exclusive use and occupancy of their respective areas of the OCS, including exclusive hunting and fishing rights, based upon unextinguished aboriginal title. The Secretary, pursuant to the Magnuson Act and the Northern Pacific Halibut Act of 1982 had promulgated regulations in 1993 limiting access to the sablefish and halibut fisheries in the Gulf of Alaska and lower Cook Inlet. Plaintiffs challenged these regulations on the ground that they improperly authorized non-tribal members to fish within plaintiffs' exclusive aboriginal territories while prohibiting plaintiffs' members from doing the same, absent an Individual Fishing Quota

(IFQ) share permit. Plaintiffs requested an injunction against the Secretary's regulations and a declaration that they hold aboriginal title and exclusive aboriginal rights to use, occupy, possess, hunt, fish, and exploit the waters, and to the mineral resources within their traditional use areas of the OCS.

This court decided the aboriginal title issue on cross-motions for summary judgment, granting the federal defendants' motion and denying plaintiffs' motion. The court held that 1) federal paramountcy precludes aboriginal title in the OCS and 2) there is no exclusive aboriginal right to fish in navigable waters based on aboriginal title outside of a treaty or federal statute.

Plaintiffs appealed this decision to the Ninth Circuit. See Native Village of Eyak v. Trawler Diane Marie, Inc., 154 F.3d 1090 (9th Cir. 1998) (Eyak I). On appeal, plaintiffs argued that Gambell III supported their position that they could hold exclusive aboriginal hunting and fishing rights in the OCS. In Gambell III, the Ninth Circuit had noted that "aboriginal rights may exist concurrently with a paramount federal interest, without undermining that interest...." Gambell III, 869 F.2d at 1277. The Eyak I court distinguished the rights being asserted in Gambell III from the rights plaintiffs were asserting in Eyak I. The court observed that plaintiffs "here assert exclusive rights of use and occupancy, not limited rights." Eyak I, 154 F.3d at 1095. The Ninth Circuit ultimately held that "the Native Villages are barred from asserting exclusive rights to the use and occupancy of the OCS based on unextinguished aboriginal title" because of the federal government's

- 7 -

paramount interest in the OCS. _Id._ at 1097. The Ninth Circuit did not reach this court's alternative holding, "that common law property precepts preclude tribes from possessing exclusive hunting or fishing rights in navigable waters absent a treaty or statute," but noted that it had previously ruled that Indian tribes do not hold such rights. _Id._ at 1097 n.6.

Plaintiffs subsequently filed the instant suit, in which they once again challenge the 1993 halibut and sablefish regulations promulgated by the Secretary. Plaintiffs now assert non-exclusive aboriginal hunting and fishing rights in their respective areas of the OCS. In its order on the cross-motions for summary judgment in _Eyak_, the court expressly stated that it was leaving "for another day the question of what non-exclusive fisheries rights, if any, plaintiffs might have in the OCS which are not dependent upon aboriginal title."[8] That other day is now here.

The Secretary argues that plaintiffs' claims are meritless because plaintiffs do not have non-exclusive aboriginal rights to hunt and fish in the waters of the OCS. However, the Secretary contends that the court need not reach the merits of plaintiffs' claims because 1) the court lacks subject matter jurisdiction over this matter, 2) plaintiffs' challenge to the sablefish regulations are barred by the Magnuson Act statute of limitations, and 3) even

---

[8]     _See_ Order re Federal Defendant's Motion for Summary Judgment; Plaintiffs' Motion for Partial Summary Judgment (June 17, 1997) at 5, Case No. A95-0063-CV (HRH), attached as Exhibit 1 to Federal Defendant's Motion for Summary Judgment, Clerk's Docket No. 25.

if plaintiffs' tribal members have non-exclusive aboriginal rights to hunt and fish in the waters of the OCS, these rights are subject to federal regulation.

## FACTS

The villages of Tatitlek and Chenega are Chugach Eskimo villages located in the Prince William Sound region of Alaska. The village of Eyak is located in the Cordova area on Prince William Sound. The villages of Nanwalek and Port Graham are Lower Kenai Eskimo villages located in the Lower Cook Inlet region of Alaska.

Until recent times, plaintiffs had no formal relationship with the United States. There were never any treaties entered into between the United States and the Coast Natives. After 1867, the conflicts between indigenous people in Alaska and incoming Americans were few and far between.[9]

Probably Alaska was spared some of the "unpleasantness" that characterized contact between settlers and indigenous peoples in the Lower 48 states because Alaska was so very large and the people here were so very few. It was not until close to the last quarter of the 20th Century that there began to be serious and meaningful discussion of the relationship between the indigenous people of Alaska and the United States Government. Congress passed up an opportunity to address the critical issue of aboriginal titles in the Alaska Statehood Act. That act gave the new State the right

---

[9] Prior to 1867, the Russians had surprisingly few skirmishes with indigenous people living away from coastal areas. They fought with the natives of Southeast Alaska and enslaved the Aleuts.

to make huge land selections. The State was entitled to acquire from the United States Government, which owned, by virtue of purchase from the Czar of Russia, all of the land in the Territory of Alaska, some 104 million acres -- about one-third of the total Alaska land mass. It was inevitable that those selections would create conflicts, but the Statehood Act did not address the question of aboriginal land titles. The Alaska land selections went forward, including a large block of land in the center of the North Slope of the Brooks Range which runs from the Canadian border west to the Chukchi Sea and separates the high north of Alaska from the rest of the State. This remote and desolate area was believed (correctly) to have great potential for oil and/or gas production. In 1968, Atlantic Richfield Company drilled the first successful oil well on the North Slope. Confirmation wells were also successful, and the huge Prudhoe Bay oilfield (which at one time was capable of supplying about one-quarter of the nation's crude oil needs) was about to become productive. However, production of the field required the construction of a pipeline running the entire length of the State, from the Arctic Ocean to Prince William Sound. That pipeline would cross lands occupied by many groups of Alaska Natives. It was at this point that the political and economic considerations, combined with the desire of Alaska Natives to have a resolution to their concerns about aboriginal lands, came together in a fashion which led to the enactment in 1971 of ANCSA. In ANCSA, Congress adopted an imaginative settlement, employing corporate entities. The Act created twelve regional corporations and

transferred to those Alaska Native controlled companies, some 40 million acres of land and $100 million in return for abrogation of aboriginal titles, including hunting and fishing rights. See 43 U.S.C. § 1603(b) ("[a]ll aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy ... and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished"). Because ANCSA was adopted in some modest haste because of the political pressure to get the pipeline right-of-way cleared, there were a number of Alaska land issues which were identified but not resolved by ANCSA. In particular, there was the thorny issue of what would be done about Native hunting and fishing rights. The Settlement Act extinguished aboriginal rights, but in substance promised that it would not be the end of Native hunting and fishing. Title VIII of ANILCA, enacted in 1980, addressed the issue of subsistence hunting and fishing by rural residents of Alaska.[10]

As mentioned above, there were never any treaties between the United States and the Alaska indigenous people. It was not until 1993, long after Congress adopted ANCSA, that the Department of Interior recognized as separate tribes all of the 225 Native villages which, like the twelve regions, were incorporated and

---

[10]    Because of concerns that specific provisions within the Alaska state constitution with respect to hunting and fishing might be violated by a Native preference as to hunting and fishing, ANILCA's subsistence hunting and fishing provisions extended rights to all rural people, not just Native Alaskans. The controversy over this and other provisions of Title VIII of ANILCA continue to the present.

received benefits (land and money) under ANCSA. Eyak and the other plaintiffs were Native villages recognized as tribes. See 58 Fed. Reg. 54364, 54368-69 (Oct. 21, 1993). In recognizing plaintiffs as tribes, the Department of Interior expressly addressed the relationship intended between the United States government and the tribes:

> [the Alaska tribes] have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States; are entitled to the same protection, immunities, privileges as other acknowledged tribes; have the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law on other tribes.

Id. at 54366.

ANCSA and ANILCA addressed issues involving Alaska Natives' aboriginal hunting and fishing rights within the state of Alaska, which includes waters and submerged lands within three miles of the coastline of the State. Here, plaintiffs, which have both governmental and corporate-for-profit status, are claiming non-exclusive aboriginal hunting and fishing rights in areas of the OCS, which includes all submerged lands lying outside state territorial boundaries but within the United States' jurisdiction and control.

Since 1976, the United States has asserted sovereign rights and exclusive fishery management authority over all fish and all continental shelf fishery resources within the exclusive economic zone (EEZ). 16 U.S.C. § 1811(a). The United States'

assertion of exclusive fisheries management in the EEZ and plaintiffs' claims of non-exclusive aboriginal rights in the OCS plainly conflict.

The Department of Commerce, pursuant to the Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1883, manages fisheries in the EEZ, including the halibut and sablefish fisheries implicated here. 16 U.S.C. § 1811(a). Plaintiffs challenge regulations promulgated by the Secretary on November 9, 1993, which are directed toward the management of the halibut and sablefish fisheries in the EEZ.

The commercial harvest of sablefish is regulated under the Magnuson Act. 16 U.S.C. §§ 1802(7) and (12) and 1811(a). In the 1993 regulations, the entire allowable harvest of sablefish was allocated to commercial fishermen using commercial gear. 50 C.F.R. § 672.24(c) (1995). No provision is made for a sport, subsistence, or tribal allocation of sablefish because it is assumed that because of the depths at which mature sablefish are found in the EEZ, there is no significant non-commercial harvest. Thus, to take sablefish, one must have an IFQ. The IFQ program is a complex fishery management scheme which restricts a person's access to the fishery based upon prior participation in the commercial fishery between 1988 and 1990. 50 C.F.R. § 676.20 (1995). Plaintiffs allege that very few of their tribal members hold sablefish IFQs.

The management of the halibut fishery is slightly more complicated. The North Pacific Halibut Act of 1982, 16 U.S.C. §§ 773-773k, implements the Convention between the United States and

Canada for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea. Under the Convention, a joint United States-Canadian commission, the International Pacific Halibut Commission (IPHC) was established to regulate the halibut fishery in "convention waters" through the annual promulgation of rules which are then enacted into regulations by each country. See 50 C.F.R. § 300.60. Convention waters include the waters of the EEZ.

The IPHC regulates both commercial and sport halibut fisheries. For the commercial fishery, the IPHC determines how much halibut can be harvested each year. The portion of the commercial halibut harvest assigned by the IPHC to convention waters in Alaska is then regulated by the North Pacific Fishery Management Council (NPFMC). 16 U.S.C. § 773c(c). The Secretary of Commerce must approve any regulations developed by the NPFMC. Id. In 1993, the NPFMC developed and the Secretary approved an IFQ program to manage the Alaska commercial halibut fishery. As with the sablefish IFQ program, access to the halibut fishery is based upon prior participation in the halibut commercial fishery between 1988 and 1990 or the ability to obtain a permit from an original participant in the fishery. 50 C.F.R. § 676.20 (1995). Plaintiffs' members are eligible for halibut IFQs although plaintiffs claim that relatively few of their members hold halibut fishery IFQs.

The Secretary also approved regulations developed by the NPFMC for the halibut sport fishery in the waters off Alaska. The sport fishery is defined as "all fishing other than commercial fishing...." 50 C.F.R. § 301.2(a) (1995), Thus, for purposes of

- 14 -

the halibut fishery, subsistence fishing by plaintiffs' members is regulated as sport fishing. These regulations currently limit a sport fisherman to using a single line with no more than two hooks. 2001 Pacific Halibut Regulations, Section 23(1), 66 Fed. Reg. 15801, 15809 (March 21, 2001). A sport fisherman is further limited to a bag limit of no more than two fish per person per day during a season that runs from February 1 to December 31 of each year.[11] <u>Id.</u>

Plaintiffs allege that all of the foregoing regulations promulgated by the Secretary effectively prohibit their tribal members from exercising their non-exclusive aboriginal right to fish for halibut and sablefish in the waters of the OCS. In Count I of their complaint, plaintiffs allege that the Secretary's failure to protect their aboriginal rights from the adverse impact of the IFQ regulations and other halibut and sablefish regulations violate plaintiffs' non-exclusive aboriginal rights to hunt, fish, and exploit the natural resources of the OCS. In Count II, plaintiffs allege that the same actions by the Secretary were in violation of the Indian Nonintercourse Act, 25 U.S.C. § 177.

Plaintiffs seek a declaration that they hold non-exclusive aboriginal rights to hunt, fish, and explore the natural resources within their traditional use areas of the OCS in the Gulf of Alaska

---

[11] The NPFMC has recently proposed new regulations that, if approved by the Secretary, would increase the current limit of two halibut per person per day to twenty halibut per person per day during the same February 1 to December 31 season. Permissible gear types would also be increased.

and Lower Cook Inlet.[12]  Plaintiffs also seek a declaration that to
the extent that the Secretary's actions adversely affected
plaintiffs' ability to exercise their non-exclusive aboriginal
rights, his actions were in violation of federal common law and the
Indian Nonintercourse Act.  Lastly, plaintiffs seek to enjoin the
Secretary from implementing the IFQ halibut and sablefish regula-
tions and any other commercial or non-commercial regulations and
from taking any other action that would violate their non-exclusive
aboriginal right to hunt and fish in the waters of the OCS.

## DISCUSSION

The question presented by this case can be simply stated:
do plaintiffs hold non-exclusive aboriginal rights to hunt, fish,
and explore the natural resources in their traditional use areas of
the OCS?  Answering that question is not so simple.  However, before
the court turns to that question, it must confront the Secretary's
contention that this court lacks subject matter jurisdiction over
plaintiffs' challenge to the sablefish regulations and the
Secretary's argument that plaintiffs' claims involving the sablefish
regulations are barred by the Magnuson Act statute of limitations.

### Jurisdiction

The Secretary's jurisdictional challenge is easily
disposed of.  The Secretary makes a cryptic two-sentence argument

---

[12]    Plaintiffs suggest that a declaration of aboriginal
fishing rights would also allow them to re-enter the commercial
salmon fishery although plaintiffs have raised no specific
challenge in their complaint to any commercial (or non-
commercial) salmon regulations.

that this court lacks subject matter jurisdiction to consider plaintiffs' challenge to the sablefish regulation.[13] In one sentence the Secretary asserts that the United States cannot be sued unless it consents to suit, which is a correct assertion. Plaintiffs allege jurisdiction based on 28 U.S.C. §§ 1331, 1346, 1361, and 1362. None of these statutes waive the United States' immunity from suit. However, the Magnuson Act provides a waiver of sovereign immunity for plaintiffs' challenge to the sablefish regulations. See 16 U.S.C. § 1855(f)(1) ("[r]egulations promulgated by the Secretary under this chapter ... shall be subject to judicial review"). In the second sentence, the Secretary asserts that claims to aboriginal rights to the EEZ and the OCS are not properly brought under the Quiet Title Act, which may also be a correct assertion, but because plaintiffs have not brought this action pursuant to the Quiet Title Act, this assertion is irrelevant. The court concludes that it has subject matter jurisdiction over plaintiffs' challenge to the sablefish regulations.

## Statute of Limitations

The Secretary next raises an argument that plaintiffs' challenge to the sablefish regulations is barred by the statute of limitations found in the Magnuson Act. "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." United States v. Mottaz, 476 U.S. 834, 841 (1986). "In particular, '[w]hen waiver

_____

[13] Federal Defendant's Motion for Summary Judgment at 14, Clerk's Docket No. 25.

legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity.'" Id. (quoting Block v. North Dakota, 461 U.S. 273, 287 (1983)). As discussed above, the court's jurisdiction over plaintiffs' challenge to the sablefish regulations is found in the Magnuson Act. Magnuson Act regulations are subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated...." 16 U.S.C. § 1855(f)(1). The IFQ regulations were promulgated on November 9, 1993. The complaint in this action was filed November 2, 1998, long after the 30 days had run. Therefore, the Secretary insists that plaintiffs' challenge to the sablefish IFQ regulations must be dismissed.

As the Secretary recognizes, the court confronted this same statute of limitations issue in Eyak, in which plaintiffs were claiming exclusive aboriginal rights to hunt and fish on the OCS. There, the court held that the Magnuson Act statute of limitations did not apply to plaintiffs' claim.[14] The court is unpersuaded that a different result is warranted by the fact that plaintiffs are no longer claiming aboriginal title and exclusive rights but rather non-exclusive aboriginal rights, which for the sake of discussion at this point, the court considers to be property rights, albeit far less than a claim of fee title.

---

[14] Although the federal defendants raised this issue on appeal, the Ninth Circuit did not reach this issue. See Eyak I, 154 F.3d at 1097 n.6.

Indian tribes are generally subject to statutes of limitations governing actions against the United States. See Sisseton-Wahpeton Sioux Tribe v. United States, 895 F.2d 588, 592 (9th Cir. 1990). Courts considering the applicability of the Magnuson Act statute of limitations "have almost universally agreed that the thirty day limit commences at the time the regulations are published and that this limit is to be strictly construed." Kramer v. Mosbacher, 878 F.2d 134, 137 (4th Cir. 1989). Courts have also held that challenges to Magnuson Act regulations are governed by the provisions of the Magnuson Act even if the gravamen of the challenge is that the regulation is inconsistent with other applicable law. See Pacific Coast Fed'n of Fishermen's Ass'n v. Secretary of Commerce, 494 F. Supp. 626, 629 n.1 (N.D. Cal. 1980) (Magnuson Act prohibition on preliminary injunctive relief applies to NEPA challenge to Magnuson Act regulation); Washington v. Daley, 173 F.3d 1158, 1170 n.16 (9th Cir. 1999) (ESA challenge to Magnuson Act regulation properly brought as a Magnuson Act challenge); Blue Water Fishermen's Ass'n v. NFMS, 158 F. Supp. 2d 118 (D. Mass. 2001) (Magnuson Act prohibition on preliminary injunctive relief applies to ESA challenge to Magnuson Act regulation). But, none of these cases involve application of the Magnuson Act statute of limitations to litigation involving claims that the Secretary's regulations adversely affect an Indian tribe's property rights. In Count I of their complaint, plaintiffs have alleged that the Secretary, in promulgating the sablefish IFQ regulations, violated federal common-law by failing to fulfill his trust obligation to protect their

aboriginal right to hunt and fish in the OCS.[15] The unique nature
of the rights asserted by plaintiffs cannot be ignored. At its
heart, this case is about Indian property rights, not the construc-
tion of the Secretary's regulatory scheme. The right to fish is
obviously an important, valuable property right, especially where
as here the resources in question are halibut and sablefish, which
are in commercial demand. The Supreme Court has clearly stated that
"[t]here is no federal statute of limitations governing federal
common-law actions by Indians to enforce property rights." Oneida
County, N.Y. v. Oneida Indian Nation of New York State, 470 U.S.
226, 240 (1985).

Nothing in the legislative history of the Magnuson Act
indicates that Congress, when enacting the 30-day statute of
limitations, contemplated that regulations passed pursuant to the
Act would result in challenges based on Indian property rights. In
enacting such a brief limitations period, it is plain that Congress
was concerned about the orderly management of commercial fishing and
was attempting to prevent a situation where an individual commercial
fisherman displeased with a regulation which allocated the fishery
for a particular season could prevent all other commercial fishermen
from fishing that year. That Congress would not have considered
challenges based on Indian property rights is understandable because
the determination of the existence of Indian property rights is
outside the scope of the Department of Commerce's fisheries

---

[15]     See Count 1, Plaintiffs' Complaint at 4, Clerk's Docket
No. 1.

management expertise. The court is satisfied that the claims plaintiffs are asserting here are not subject to the very short statute of limitations which would apply to those who have nothing more than a right in common with everyone else to fish on the high seas subject to the general laws implemented by Congress for such fishing but rather are subject to no statute of limitations as set forth in Oneida County, 470 U.S. at 240. The court concludes that 16 U.S.C. § 1855(f) does not bar plaintiffs' claims as they relate to the sablefish regulations.

### Plaintiffs' Claims to Non-Exclusive Aboriginal Rights

The court turns now to the issue that is at the heart of plaintiffs' case, whether plaintiffs hold non-exclusive aboriginal rights in the OCS. The starting point of that discussion is to define what kind of aboriginal rights plaintiffs are asserting.

Generally, aboriginal rights are considered to be the "right[]s of exclusive use and occupancy held by Natives in lands and waters used by them and their ancestors prior to the assertion of sovereignty over such areas by the United States." Gambell I, 746 F.2d at 574 (emphasis added). Such aboriginal hunting and fishing rights are founded on immemorial custom and practice.[16] Continuous, exclusive hunting and fishing within a defined territory for a long period of time gives rise to the aboriginal right to continue hunting and fishing in that same area. Aboriginal hunting and fishing rights can exist without aboriginal title and are not

---

[16]    Felix S. Cohen's Handbook of Federal Indian Law 442 (Rennard Strickland, ed., 1982).

dependent upon recognition in a treaty or by an act of Congress.[17] Aboriginal fishing and hunting rights are retained unless granted to the United States by treaty, abandoned, or extinguished by statute.[18]

Having lost their claims to exclusive fishing rights in the OCS in _Eyak I_, plaintiffs now assert a _non-exclusive_ aboriginal right to hunt and fish in the OCS. They are asserting the right to take fish in the OCS in common with others. In this respect, the rights plaintiffs assert are similar to the treaty rights held by a number of Indian tribes in western Washington state.

In 1855, Governor Isaac Stevens, on behalf of the United States, negotiated five treaties with the Indian tribes in the Western Washington Territory. By the terms of the treaties, which are often referred to as the Stevens Treaties, "[t]he Tribes ceded their aboriginal lands to the United States for settlement, receiving in exchange exclusive title to defined lands, free medical care, schools, occupational training, and annuity payments." _United States v. Washington_, 157 F.3d 630, 638 (9th Cir. 1998). The tribes reserved both on-reservation fishing rights and off-reservation fishing rights. The on-reservation rights were exclusive rights. The off-reservation rights were not. The off-reservation rights allowed the tribes to take fish "at usual and accustomed grounds and stations" either "in common with all citizens of the Territory" or

---

[17]     _Id._

[18]     _Id._ at 442-43.

"in common with all citizens of the United States."  Midwater Trawlers Co-op. v. Dep't of Commerce, 282 F.3d 710, 718 and 718 n.2 (9th Cir. 2002).  The Supreme Court described the nature of these rights as follows:

> "[T]he treaty was not a grant of rights to the Indians, but a grant of rights from them--a reservation of those not granted.... There was an exclusive right to fishing reserved within certain boundaries.  There was a right outside of those boundaries reserved 'in common with citizens of the Territory.'  As a mere right, it was not exclusive in the Indians.  Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise."

Washington v. Washington State Commercial Passenger Fishing Vessel Assoc., 443 U.S. 658, 680 (1979) (quoting United States v. Winans, 198 U.S. 371, 380-81 (1905)).  Courts interpreting the Stevens Treaties have consistently adopted this viewpoint, that the treaties were not a grant of rights to the Indians but a grant of rights from them and that the tribes retained rights not expressly granted to the United States.

The court does not perceive any reason why the principles of the Stevens Treaties cases do not apply here where we have a statutory abrogation of land-based and near-shore aboriginal rights coupled with an implicit reservation of unextinguished aboriginal rights, if any, in the OCS.  Under the principles of the Stevens Treaties cases, any rights not expressly granted to the United States are reserved or retained by the Indian tribes.  The Alaska tribes, while having no treaties with the United States, were required to give up aboriginal property rights in return for fee

title to certain land and other benefits, just as the treaty tribes did.  And, just as the treaty tribes retained off-reservation fishing rights, that were not extinguished by treaty, the Alaska non-treaty tribes would retain any extant aboriginal rights which were not extinguished by statute.

Plaintiffs are Alaska Native villages whose aboriginal titles were abrogated by ANCSA.  Because ANCSA does not reach the OCS, it is legally possible that plaintiffs retained aboriginal hunting and fishing rights on the OCS, in the nature of non-reservation usufructuary rights held in common with non-Native citizens.  The possibility of exclusive aboriginal rights necessarily implies the possibility of non-exclusive rights, which plaintiffs now claim.[19]

The Secretary contends that Gambell III only recognized possible subsistence rights, implying that if plaintiffs have any aboriginal rights in the OCS they are limited to subsistence rights.  But, the distinction that the Secretary draws between commercial and subsistence rights fails to recognize the breadth of plaintiffs' claims.  The court understands plaintiffs to claim a non-exclusive right to participate in the regulated halibut and sablefish fisheries.  Implicit in the comparison of plaintiffs' non-treaty rights to the treaty tribes' rights is that such rights include commercial fishing as well as subsistence fishing.

---

[19]    The court speaks here of legal theories, not the fact question of what, if any, aboriginal hunting and fishing rights plaintiffs have retained.

Plaintiffs' claim to retained non-exclusive hunting and fishing rights on the OCS in common with other citizens of the United States gives rise to the question of whether such property claims are legally different from exclusive hunting and fishing rights based on aboriginal title, which are precluded by the doctrine of federal paramountcy. As discussed above, in Eyak I, the Ninth Circuit held that plaintiffs' claim that they were entitled to exclusive hunting and fishing rights based on aboriginal title on the OCS was precluded by the federal paramountcy doctrine. For the reasons stated below, the court concludes that there is no legal difference between an exclusive claim to hunt and fish in the OCS and a non-exclusive claim when it comes to the doctrine of federal paramountcy, despite a suggestion to the contrary in Gambell III.

The four Supreme Court cases from which the federal paramountcy doctrine is derived make clear that the Federal Government in the first instance has the paramount right and power to determine how and when the resources in the OCS should be used and by whom. See United States v. California, 332 U.S. 19 (1947); United States v. Louisiana, 339 U.S. 699 (1950); United States v. Texas, 339 U.S. 707 (1950); and United States v. Maine, 420 U.S. 515 (1975). Eyak I made clear that the same principles of federal paramountcy apply whether it is a sovereign state or an Indian tribe asserting exclusive rights and that any exclusive rights in the OCS are precluded. Even though plaintiffs have labeled the rights they are asserting here as non-exclusive rights, the court is hard pressed to understand how these rights are any different than the

rights that plaintiffs asserted in <u>Eyak I</u>, despite what <u>Gambell III</u> said about external sovereignty.

In <u>Gambell III</u>, the Ninth Circuit noted that "aboriginal rights may exist concurrently with a paramount federal interest, without undermining that interest." <u>Gambell III</u>, 869 F.2d at 1277. The <u>Gambell III</u> court found the Native Villages' argument that they possess rights of occupancy and use that are subordinate to and consistent with national interests persuasive and concluded that the Native Villages' asserted aboriginal rights were subordinate to the federal government's paramount rights. <u>Id.</u> If this language merely means that for purposes of <u>Gambell III</u>, subsistence hunting and fishing rights did not conflict with the federal interest in mineral leasing, then <u>Gambell III</u> is of little consequence here. But, if the quoted language is a statement of law of paramountcy, it is wrong. It is inconsistent with the broad language of the above-referenced Supreme Court decisions which stand for the proposition that:

> once low-water mark is passed the international domain is reached. Property rights must then be so subordinated to political rights as in substance to coalesce and unite in the national sovereign.... If the property, <u>whatever it may be</u>, lies seaward of low-water mark, its use, disposition, management, and control involve national interests and national responsibilities. That is the source of national rights in it.

<u>Texas</u>, 339 U.S. at 719 (emphasis added).

In <u>Eyak I</u> the Ninth Circuit observed that plaintiffs' concession that the federal government could enact laws that would

allow non-tribal members to also fish in the areas claimed by the Villages was not a concession at all. _Eyak I_, 154 F.3d at 1096. The Ninth Circuit compared this to Texas arguing that there could somehow be joint ownership of the OCS by Texas and the United States, an argument that the Supreme Court rejected because when dealing with the ocean "'[p]roperty rights must then be so subordinate to political rights as in substance to coalesce and unite in the national sovereign.'" _Id._ (quoting _Texas_, 339 U.S. at 719). This court understands the Supreme Court and the _Eyak I_ court to hold that the type of property right being asserted, exclusive or non-exclusive, does not matter because the federal government's rights in the OCS are paramount, period. In other words, the argument that plaintiffs raise in the instant case is the very same argument, albeit in different clothing, that they made in _Eyak I_; and that argument was rejected by the Ninth Circuit. Plaintiffs have simply substituted here a claim to property in common with other citizens for a claim to property in common with the United States government. _Eyak I_ rejected the latter. This court rejects the former for lack of any substantive difference.

The dominance of national sovereignty is as much undermined by a claim of non-exclusive rights in the OCS as was the case with a claim of exclusive rights. That this is so is made even more clear by reason of plaintiffs' status as governmental entities in relation to the United States. Alaska tribes are appropriately zealous of their status as sovereigns with the United States and the State of Alaska. But, there is only one paramount sovereign in the

OCS and that is the United States government. Plaintiffs' claims to non-exclusive hunting and fishing rights in the OCS cannot survive in that environment.

Regardless of whether plaintiffs label their rights exclusive or non-exclusive, the fishing rights they are asserting flow from the sovereignty, which the court here assumes they once had over the OCS, prior to the federal government asserting its paramount sovereignty over the area.[20] The federal government can extinguish such rights "'by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy or otherwise....'" Confederated Tribes of Chehalis v. Washington, 96 F.3d 334, 341 (9th Cir. 1996) (quoting United States v. Santa Fe Pacific R.R. Co., 314 U.S. 339, 347 (1941)). When the United States asserted complete dominion over the OCS, any fishing rights that plaintiffs might have retained were extinguished. Just as Texas was precluding from claiming any proprietary rights in the OCS based on its former sovereignty, plaintiffs are also precluded from holding any proprietary rights in the OCS, whether those rights be called exclusive or non-exclusive.

Superficially, the Stevens treaties tribes cases might seem to indicate a contrary conclusion, i.e., that plaintiffs should be able to hold non-exclusive rights in the OCS despite the federal government's paramount control over the OCS. Some of the Stevens

---

[20]    In this respect, plaintiffs asserted fishing rights are no different from the Stevens treaty tribe fishing rights, which also flow from their aboriginal title. See United States v. Washington, 157 F.3d 630, 644 (9th Cir. 1998).

Treaties tribes were ocean-going tribes, in particular the Makah Indian tribe. Courts have determined that the Makah tribe's usual and customary fishing ground extends forty miles offshore. Thus, the Makah's usual and customary fishing ground extends into the OCS and into waters under the control of the United States. See United States v. Washington, 730 F.2d 1314, 1317-18 (9th Cir. 1984). There has never been any suggestion that the Makah cannot hold non-exclusive treaty fishing rights in the OCS because of the federal government's paramount interest in the OCS. Rather, it has been repeatedly recognized by state and federal courts that the Makah hold such rights in the OCS, even though the Makah's treaty fishing rights on the OCS are plainly subject to federal regulation and the federal government's power to control the use of resources in the OCS remains paramount. See, e.g., Midwater Trawlers Co-op. v. Dep't of Commerce, 282 F.3d 710 (9th Cir. 2002).

There is an important difference between the fishing rights that the Makah hold in the OCS and the fishing rights that plaintiffs assert here. The Makah's rights were expressly reserved in a treaty. In Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176, 180 n.12 (9th Cir. 1981), the court observed that "[a]n aboriginal right to fish has been recognized only in the context of interpretation of a ratified treaty or federal statute, where courts have held that aboriginal fishing rights were impliedly reserved to the Indians." In Western Shoshone Nat'l Council v. Molini, 951 F.2d 200, 202-03 (9th Cir. 1991), the court reiterated this principle, holding that the tribe's aboriginal hunting and fishing rights were

taken when full title extinguishment occurred absent express
reservation of those rights. In Confederated Tribes of Chehalis,
96 F.3d at 341, the court observed that "[e]xtinguishment terminates
corresponding use and occupancy rights, including fishing rights,
except where such rights are expressly or impliedly reserved in a
treaty, statute or executive order."[21] The Makah have non-exclusive
fishing rights in the OCS because of the reservation of those rights
in its treaty with the United States.

Here, plaintiffs can point to no express reservation and
acknowledgment of hunting and fishing rights in the OCS. Here,
neither the Statehood Act, ANILCA, or any other federal law, nor any
treaty expressly acknowledged the reservation of fishing rights in
the OCS. However, the court is not saying that plaintiffs have no
aboriginal non-exclusive hunting and fishing rights in the OCS
because plaintiffs lack statutory or treaty recognition of such
rights. ANCSA does not reach beyond the boundary of the State of
Alaska (see Gambell III, 869 F.2d at 1277); so, plaintiffs might
have had unextinguished rights in the OCS. Plaintiffs do not now
have such rights because, if they existed in 1950,[22] those rights

_____

[21]    The Executive Order that recognized plaintiffs as
tribes contained no express or implied reservation of rights to
the tribes.  On the contrary, that Executive Order strongly
emphasized that the tribes were to be treated as governmental
entities.  As such, plaintiffs are subject to the primary
sovereignty of the United States with respect to the OCS.  See
Texas, 339 U.S. at 718-20.

[22]    By 1950, the paramountcy doctrine was fully developed
by the United States Supreme Court.  See United States v. Texas,
339 U.S. 707 (1950).

- 30 -

were then in conflict with the paramountcy doctrine and were nullified by that doctrine for lack of the treaty protection which the Makah enjoyed after 1855.

The court is aware that a conclusion that plaintiffs cannot hold non-exclusive fishing rights in the OCS may seem to contradict the Ninth Circuit's holding in Gambell III, but, as discussed above, the court is convinced that Eyak I substantially undercut plaintiffs' argument based upon the holding of Gambell III. The Eyak I panel rejected plaintiffs' argument that the rights that they were asserting were somehow subordinate to the federal government's rights, despite Gambell III's holding that subordinate fishing rights could exist in the OCS concurrently with the federal government's paramount rights in the OCS. This court is convinced that the non-exclusive rights that plaintiffs are asserting here are, at their core, no different than the subordinate, exclusive rights they were asserting in Eyak I, rights that the Ninth Circuit held were inconsistent with the paramountcy doctrine.

### Extinguishment of Commercial Rights by the Russians

The Secretary argues that plaintiffs' non-exclusive aboriginal rights to engage in the commercial fishery on the OCS and the EEZ, if they ever had such rights, was extinguished when the Russian American Company was granted its 1821 and 1844 Charters. The Charters provided that the Chugach could engage in a subsistence fishery on their own shore but were precluded from engaging in commercial activities or going to another shore without permission

of the Russian-American Company.[23]  The 1844 Charter granted the
Russian American Company the right to hunt and fish to the exclusion
of all other Russian subjects; included in the definition of Russian
subjects are the Chugach.[24]

The Secretary made this same argument in _Eyak_. There, the
court held that this argument must fail because it is settled law
that the Treaty of Cession of 1867 between the United States and
Russia did not extinguish aboriginal rights.  See _Tlingit & Haida
Indians of Alaska v. United States_, 147 F.2d 452, 463-64 (Ct. Cl.
1959); _Edwardsen v. Morton_, 369 F. Supp. 1359, 1363 (D.D.C. 1973).
The court went on to explain that if the Treaty of Cession, an act
of the Russian government, did not extinguish aboriginal rights,
then charters of a private trading company issued twenty to forty
years before the treaty could not have extinguished aboriginal
rights.  The court perceives no reason why the same would not be
true here, where plaintiffs are asserting non-exclusive aboriginal
rights held in common with all citizens of the United States.

### Federal Regulation of Non-exclusive Rights

The Secretary does not contend that any act of Congress
or any Executive action has abrogated plaintiffs' claims of non-
exclusive hunting and fishing rights in the OCS.  Rather the

---

[23]    See 1821 Charter at ¶¶ 42 and 56 and 1844 Charter at ¶¶
247 and 264, relevant portions attached as Exhibit 10, Federal
Defendant's Motion for Summary Judgment, Clerk's Docket No. 25.

[24]    1844 Charter at ¶ 249, relevant portion attached as
Exhibit 10, Federal Defendant's Motion for Summary Judgment,
Clerk's Docket No. 25.

Secretary urges that he has the power to regulate the taking of sablefish and halibut in the OCS and has done so in a fashion which does not preclude or foreclose all fishing for sablefish and halibut by plaintiffs' members.

Assuming again for purposes of further discussion that plaintiffs hold non-exclusive hunting and fishing rights in the OCS, those rights are subject to reasonable regulation. See, e.g., Aleut Community of St. Paul Island v. United States, 117 F. Supp. 427 (Ct. Cl. 1954).

Although it is clear to the court that the Secretary has the power to regulate the sablefish and halibut fisheries, including such rights as plaintiffs assert, the Secretary has not undertaken to do so. The Secretary has promulgated or approved regulations which do not in any express or other ascertainable fashion address tribal hunting and fishing rights in the OCS. The regulations appear to assume the non-existence of such rights. Based on the above description of the management programs for the sablefish and halibut fisheries, it is clear that the interposition of any number of IFQs or any other specific allocation of the fisheries to plaintiffs could constitute a huge deviation from the current management plans for those fisheries. The Secretary's discussion of the opportunities plaintiffs' members have to participate in the sablefish and halibut fisheries does not respond to plaintiffs' tribal claims based upon historic use by the tribes. That possible use has not been shown to have been considered in promulgating the challenged regulations. If plaintiffs have the right to take

sablefish and halibut in common with others, which this discussion assumes, then the Secretary's extant management plans and regulations must necessarily fail to carry out the requirements of 16 U.S.C. 1853(a) and 16 U.S.C. § 773c(c). The regulations become fatally arbitrary if plaintiffs have the rights which they assert and we here assume.

## Custom or Prescription

As an alternative, plaintiffs argue that they have acquired non-exclusive hunting and fishing rights in the OCS based on custom and prescription. Under the doctrine of custom, the common law of England "includes ... the particular customs of certain parts of the kingdom."[25] American courts have recognized and employed this doctrine in adjudicating usufructuary rights. See United States v. St. Thomas Beach Resorts, Inc., 386 F. Supp. 769, 772-73 (D.V.I. 1974); Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n, 903 P.2d 1246, 1261 (Haw. 1995); State ex rel. Thorton v. Hay, 462 P.2d 671, 676-78 (Or. 1969). In order to establish a right based on custom, a plaintiff must show (1) long and general usage; (2) without interruption; (3) peaceful and free of dispute; (4) reasonable use; (5) certain as to its scope and character; (6) obligatory, i.e., recognized without exception; and (7) not contrary to other customs or laws of the state. Thorton, 462 P.2d at 676-78.

---

[25]   1 Blackstone, Commentaries on the Laws of England (William Carey ed., 1916).

Even if the doctrine of custom were applicable here, the court cannot perceive how plaintiffs could establish rights on the OCS based on custom in light of the federal government's paramount interest in the OCS. In addition, there are genuine issues of material fact as to whether plaintiffs have met the requirements necessary to prove custom.

As for prescription, plaintiffs admit that prescriptive rights cannot be acquired against the United States but argue that because their rights preceded United States sovereignty they should be able to assert such rights in this instance. A similar argument was made by California and rejected by the Supreme Court in <u>United States v. California</u>, 332 U.S. 19, 39-40 (1947). Thus, plaintiffs' argument here must fail as well.

### Count II of Plaintiffs' Complaint

In Count II of their complaint, plaintiffs allege that the Secretary has violated the Indian Nonintercourse Act, which provides that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177.

The parties ignore this claim in their briefing, beyond plaintiffs' cursory mention of the trust obligation that the Nonintercourse Act imposes on the federal government. The court questions the viability of such a claim against an official of the United States government. The court also questions the viability

of such a claim if plaintiffs are found to not hold non-exclusive aboriginal fishing and hunting rights in the OCS. However, despite the court's reservations about the viability of Count II of plaintiffs' complaint, the court declines to dismiss this count absent input from the parties.

CONCLUSION

Because the court concludes that plaintiffs' claim of non-exclusive aboriginal hunting and fishing rights in the OCS cannot exist as a matter of law due to the United States' paramount sovereignty, the court does not address the question of whether or not the historic facts would have supported the claims which plaintiffs make to non-exclusive hunting and fishing rights in the OCS. Plaintiffs' motion for summary judgment is denied. The Federal Defendant's motion is granted in part and denied in part. Count I of plaintiffs' complaint is dismissed.

DATED at Anchorage, Alaska, this 25 day of September, 2002.

H. Russel Holland, Judge
District of Alaska

RECEIVED

NOV 2 0 2002

NARF ALASKA

FILED

NOV 1 9 2002

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____ Deputy

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA

NATIVE VILLAGE OF EYAK ET AL,
     Plaintiff,

Case Number A98-365CV (HRH)

v.

DONALD EVANS,
     Defendant.

**JUDGMENT IN A CIVIL CASE**

____ **JURY VERDICT.** This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

__X__ **DECISION BY COURT.** This action came to trial or hearing before the court. The issues have been tried or heard and a decision has been rendered.

     IT IS ORDERED AND ADJUDGED:

     THAT plaintiffs' complaint is dismissed with prejudice.

APPROVED:

H. Russel Holland
United States District Judge

_November 19, 2002_
Date

Michael D. Hall
Clerk

(By) Deputy Clerk

MAILED ON __11/19/02__

BY _____

A98-0365--CV (HRH)
----------------------------------------------------
B. LANDON (AUSA)
L. ASCHENBRENNER
O&J 11455

(50)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

**FILED**

NOV 1 4 2002

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____ Deputy

NATIVE VILLAGE OF EYAK, et al.,　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiffs,　)
　　　　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
DONALD EVANS, Secretary of　　　　)
Commerce,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Defendant.　 )　　No. A98-0365-CV (HRH)
　　　　　　　　　　　　　　　　　　)
_____)

**RECEIVED**

NOV 1 5 2002

NARF ALASKA

O R D E R

Motion for Reconsideration

　　　　Plaintiffs move for reconsideration[1] of the court's order
granting defendant's motion for summary judgment and dismissing
Count I of plaintiffs' complaint.[2]  The court granted defendant
leave to file an opposition to the motion for reconsideration and
plaintiffs leave to file a reply.[3]  Defendant has timely filed an
opposition,[4] and plaintiffs have timely filed their reply.[5]  Oral
argument has not been requested and is not deemed necessary.

---

[1]　　Clerk's Docket No. 43.

[2]　　Order re Cross-Motions for Summary Judgment (Sept. 25,
2002), Clerk's Docket No. 42.

[3]　　See Minute Order (Oct. 8, 2002), Clerk's Docket No. 44.

[4]　　Clerk's Docket No. 46.

[5]　　Clerk's Docket No. 48.

- 1 -

49

## BACKGROUND

Plaintiffs are Alaska Native villages which claim non-exclusive hunting and fishing rights in the Outer Continental Shelf (OCS). Defendant is Donald Evans, Secretary of the Department of Commerce, who, pursuant to the Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-83, manages fisheries in a two-hundred-mile belt of ocean waters known as the Exclusive Economic Zone.

In the instant suit, plaintiffs challenge the 1993 halibut and sablefish regulations promulgated by the Secretary. In Count I of their complaint, plaintiffs allege that the Secretary's failure to protect their aboriginal rights from the adverse impact of the halibut and sablefish regulations violates plaintiffs' non-exclusive aboriginal rights to hunt, fish, and exploit the natural resources of the OCS. In Count II, plaintiffs allege that the same actions by the Secretary were in violation of the Indian Nonintercourse Act, 25 U.S.C. § 177.

In the September 25, 2002, order on cross-motions for summary judgment, the court concluded that plaintiffs' claim of non-exclusive aboriginal hunting and fishing rights in the OCS could not exist as a matter of law due to the United States' paramount sovereignty in the OCS. As a result of this conclusion, the court dismissed Count I of plaintiffs' complaint. Although expressing doubts about the continued viability of Count II of plaintiffs' complaint, the court declined to dismiss Count II absent input from the parties. Plaintiffs now move for reconsideration of the dismissal of

Count I and provide the court with input as to the viability of Count II of their complaint.

## DISCUSSION

Reconsideration of a grant of summary judgment "is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." School Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993).

## Count I

Plaintiffs assert that the court committed clear error in dismissing Count I of their complaint because the court's order is in direct conflict with People of the Village of Gambell v. Hodel, 869 F.2d 1273 (9th Cir. 1989) (Gambell III). In Gambell III, the Ninth Circuit noted that "aboriginal rights may exist concurrently with a paramount federal interest[.]" Id. at 1277. In its order of September 25, 2002, the court concluded that if this language were intended to be a statement of the law of paramountcy, it was wrong because it was inconsistent with the Supreme Court cases that have developed the doctrine of federal paramountcy.[6] The court went on to distinguish plaintiffs' non-exclusive fishing rights from the fishing rights held by the Makah in the OCS because the Makah's rights were expressly reserved in its treaty with the United States. The primary argument raised by plaintiffs on motion for reconsidera-

---

[6]    Order re Cross-Motions for Summary Judgment at 26, Clerk's Docket No. 42.

tion is that their asserted hunting and fishing rights should be on the same footing as the Makah's rights because plaintiffs' non-exclusive hunting and fishing rights in the OCS have been impliedly reserved by Congress in three federal statutes.

The three federal statutes in which plaintiffs contend Congress impliedly reserved their non-exclusive aboriginal rights are the Magnuson Act, 16 U.S.C. §§ 1801-83, the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-56a, and the Submerged Lands Act, 43 U.S.C. §§ 1311-15. The Magnuson Act, which was enacted in 1976, provides that any fishery management plan must be consistent with "any other applicable law[.]" 16 U.S.C. § 1853(a)(1)(a). The Ninth Circuit has interpreted "any other applicable law" to include Indian fishing rights that exist under federal law. See Parravano v. Babbitt, 70 F.3d 539, 544 (9th Cir. 1995). Because plaintiffs believe that the rights they assert exist under federal law, they argue that their non-exclusive aboriginal fishing rights in the OCS were protected by Congress when it enacted the Magnuson Act. The OCSLA and the Submerged Lands Act, both of which were enacted in 1953, have almost identical savings clauses which state that nothing contained in the acts:

> shall affect such rights, if any, as may have been acquired under any law of the United States by any person in lands subject to this subchapter ... and such rights, if any, shall be governed by the law in effect at the time they may have been acquired[.]

43 U.S.C. §§ 1315 & 1342. Plaintiffs argue that these two savings clauses plainly show that Congress intended to protect preexisting

rights in the OCS, including non-exclusive aboriginal rights. Plaintiffs argue that these savings clauses cannot be dismissed as having no bearing on the question of federal paramountcy because if all non-federal rights in the adjacent sea were automatically barred by federal paramountcy, there would have been no need to protect preexisting rights by inserting savings clauses. Plaintiffs also rely on legislative history for all three statutes to support their argument that Congress intended to protect preexisting rights, including aboriginal rights, when it enacted these three federal statutes.

The non-exclusive hunting and fishing rights which plaintiffs assert were not "preexisting" rights when the above three federal statutes were enacted. Rather, plaintiffs' non-exclusive hunting and fishing rights in the OCS, assuming they ever possessed such rights, had already been extinguished by federal paramountcy absent a treaty or statute preserving those rights. See Confederated Tribes of Chehalis Indian Reservation v. State of Washington, 96 F.3d 334, 341 (9th Cir. 1996) ("Extinguishment terminates corresponding use and occupancy rights, including fishing rights, except where such rights are expressly or impliedly reserved in a treaty, statute or executive order."). Plaintiffs have no treaty or statutory hunting or fishing rights. As the court noted in its order of September 25, 2002, the federal paramountcy doctrine was fully developed by 1950.[7] Thus, by the time any of the above legislation

---

[7]    Order re Cross-Motions for Summary Judgment at 30-31, Clerk's Docket No. 42.

was enacted, any non-exclusive hunting and fishing rights that plaintiffs might have held in the OCS were already extinguished.

Plaintiffs respond by arguing that the court did not say that plaintiffs' asserted rights in the OCS had been extinguished or terminated. Rather, the court said those rights were "nullified".[8] What plaintiffs overlook is that the September 25, 2002, order also plainly said that "[w]hen the United States asserted complete dominion over the OCS, any fishing rights that plaintiffs might have retained were extinguished."[9] Assuming, for the sake of discussion, that Congress intended to protect preexisting aboriginal rights when it enacted the three statutes on which plaintiffs rely, plaintiffs' asserted rights were not "saved" because they had already been extinguished. There is certainly no evidence that Congress intended to reserve, retain, or save rights that no longer existed.

Plaintiffs also advance an argument that the court's holding was clearly wrong because the aboriginal claims which they are asserting are distinguishable from the claims asserted by the states in the paramountcy cases. Plaintiffs' basic premise is that because Congress can control plaintiffs' property rights and governing powers, their non-exclusive aboriginal claims do not pose a threat to the federal government's external sovereignty. Plaintiffs raised, and the Ninth Circuit rejected, a similar argument as to

---

[8]     Id.

[9]     Id. at 28.

their exclusive rights in <u>Eyak I</u>; and this court has already considered and rejected this argument in the instant case.

In light of the foregoing, the court need not address the other arguments raised on reconsideration. Having reconsidered the order of September 25, 2002, the court concludes that it is correct as a matter of law.

<u>Count II</u>

In the September 25, 2002 order, the court questioned whether an Indian Nonintercourse Act claim could be brought against an official of the United States government, and whether Count II could survive if plaintiffs did not hold non-exclusive aboriginal hunting and fishing rights in the OCS.

As to the first question, plaintiffs contend that such a claim can be asserted against an official of the United States government. For support, plaintiffs cite <u>United States v. Santa Fe Pacific R.R.</u>, 314 U.S. 339, 360 (1941), and <u>Cramer v. United States</u>, 261 U.S. 219, 235 (1923). However, neither of these cases involved a Nonintercourse Act claim brought against an official of the federal government.

As to the second question, plaintiffs agree that if they do not hold non-exclusive aboriginal hunting and fishing rights in the OCS, Count II must fail.[10]

---

[10] Plaintiffs' Memorandum in Support of Motion for Reconsideration (etc.) at 8, Clerk's Docket No. 43.

## CONCLUSION

Plaintiffs' motion for reconsideration is granted. On reconsideration, the court's holding as to Count I is readopted for the reasons stated previously and here. Plaintiffs' Count II is dismissed. The clerk of court shall enter judgment dismissing plaintiffs' complaint with prejudice.

DATED at Anchorage, Alaska, this _13_ day of November, 2002.

H. Russel Holland
United States District Judge

A98-0365--CV (HRH)
-----------------------------------------------------
B. LANDON (AUSA)
L. ASCHENBRENNER

MAILED ON __11/14/02__
BY_____

- 8 -